Christopher P. Schueller, Esquire
New York Bar No. 2582914
**BUCHANAN INGERSOLL & ROONEY PC**
640 5th Avenue, 9th Floor
New York, NY 10019
Telephone: (212) 440-4400
Fax: (212) 440-4401
E-mail: christopher.schueller@bipc.com
*Attorneys for Secured Creditor McCormick 103, LLC*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re: | Chapter 11 |
| GREG BEECHE, LOGISTICS, LLC, | Case No. 25-11257-1-pgr |
| Debtor. | ***Emergency Hearing Requested*** |

---

**EMERGENCY MOTION TO DISMISS BY SENIOR SECURED CREDITOR MCCORMICK 103, LLC PURSUANT TO 11 U.S.C. § 1112(b) BASED ON A BAD FATIH FILING, OR IN THE ALTERNATIVE, TO EXCUSE THE TURNOVER OF ASSETS BY THE RECEIVER PURSUANT TO 11 U.S.C. § 543(d)**

Senior Secured Creditor McCormick 103, LLC (*"**Secured Creditor**"*), by and through its attorneys, Buchanan Ingersoll & Rooney PC, files this Emergency Motion ("**Motion**") to Dismiss Pursuant to 11 U.S.C. § 1112(b) Based on a Bad Faith Filing, or in the Alternative, to Excuse the Turnover of Assets by the Receiver Pursuant to 11 U.S.C. § 543(d), and respectfully states as follows:

## I.  <u>PRELIMINARY STATEMENT</u>

1.  The debtor Greg Beeche, Logistics, LLC ("**Debtor**") commenced this Chapter 11 case in bad faith. The Debtor cannot reorganize, and the Debtor knows it.

2.      The Debtor closed operations approximately two months ago.  The Debtor has no employees.  The Debtor has no customers.  The Debtor has no income.  The Debtor has no DIP financing.  The Debtor has no authority to use cash collateral.  The Debtor has no ability to provide adequate protection.  The Debtor lost approximately $10 million in 2023 and 2024.  In 2025, the Debtor's losses are so bad that the Debtor refuses to disclose them.  The Debtor owes its senior secured lender approximately $11.7 million and has not made a loan payment to that senior secured lender for two years.  The Debtor's assets are at best worth  $5 million.  The Debtor failed to pay its employees for 4 months in 2025.  The Debtor allowed its insurance to lapse in 2025.  The Debtor owes a union $1.4 million.  The Debtor owes two judgment creditors approximately $3 million.  In August of 2025, a federal judge appointed a receiver over the Debtor because of its insolvency and the need to protect the Secured Creditor's collateral.

3.      The Debtor's former management, led by majority owner Gregory Beeche ("**Beeche**"), was grossly incompetent.  The Debtor is in the construction business.  It engineers and supplies scaffolding.   Yet Beeche rarely entered into any written agreements with his customers, even on multi-million dollar jobs.  In addition, Debtor was terminated earlier in 2025 on its biggest project because of its inability to perform.  To cover the damage caused by Debtor to the general contractor on that job, the Debtor gave that contractor equipment that was the Secured Creditor's collateral.  The Debtor was so incompetent that by 2025 it was forced to reduce the types of services it provided to customers.

4.      Over the past few days, Beeche has engaged in erratic behavior.  On two separate occasions, Beeche has entered the property under the receiver's control and used bolt cutters to cut locks.  Beeche  then tried to remove the Secured Creditor's collateral and send that collateral to

one of Debtor's prior customers.  The receiver has called the police twice over these incidents.

Debtor's counsel is aware of the incidents and understands how inappropriate they are.

5.      The Debtor never intended to reorganize, and by any objective measure, cannot

reorganize.  The only reason the Debtor filed a Chapter 11 case for a company that is already out

of business is to promote the selfish interests of Beeche.  After Beeche had already agreed to a

global settlement that would result with the receiver selling the Debtor's assets, Beeche demanded

that the Secured Creditor pay off $3 million in judgment liens which have attached to Beeche's

personal residences.  Absent this, Beeche threatened to disrupt the sale process.  When the Secured

Creditor refused Beeche's unreasonable demands, Beeche filed this Chapter 11 case to prevent the

receiver from selling the Debtor's assets.  The sole purpose of this Chapter 11 case is to obstruct

and frustrate the Secured Creditor and prevent the receiver from completing a liquidation sale.

The bankruptcy has disrupted the sale of Debtor's assets to a good buyer.  Beeche is hoping that

this delay will give Beeche leverage to extract unreasonable concessions from the Secured

Creditor.

6.      This is a textbook bad faith filing.  The case should be dismissed right away.

However, in the alternative, the Secured Creditor respectfully requests that the receiver be excused

from returning the assets to the Debtor.  Beeche cannot be trusted to act in the best interest of

creditors.

7.      For these and other reasons discussed in more detail below, the Secured Creditor

respectfully requests that the Court grant the Motion.

8.      The Secured Creditor filed this motion on an emergency basis in the hope that, by

dismissing the bankruptcy quickly, the receiver will not lose a buyer currently at the table who is

willing to pay $5 million for the Debtor's assets.  The closing on that sale was supposed to take place in early November of 2025.

## II.    JURISDICTION AND VENUE

9.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334(a).  Venue of this Case and Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The subject matter of the Motion is a "core proceeding" within the purview of, without limitation, 28 U.S.C. § 157(b)(2).

10.    The statutory predicates for the relief sought in the Motion are Sections 1112(b) and 543(d) of Title 11 of the United States Code ("**Bankruptcy Code**").

## III.    FACTUAL BACKGROUND[1]

**Debtor**

11.    Debtor (www.gregbeeche.com) is a construction company which is no longer in operation.  Before shutting down operations, the Debtor designed, manufactured, delivered, erected, supervised, used, and then dismantled its adaptable, modular scaffolding and other work access systems. The company provided logistics planning, master rigging services, professional engineering services, field training and project oversight.  Beeche is the majority owner of Debtor. Beeche also owns non-Debtor Greg Beeche Logistics, LLC ("**GL**"), but it is unclear whether GL owns any assets or has any operations.

**Pre-Petition Loans from Bank of America, N.A.**

**The First Loan**

12.    On April 20, 2017, Beeche obtained a term loan ("**First Loan**") in the amount of $3,600,000 from Bank of America, N.A. ("**Original Lender**"), and in connection with this loan

---

[1] Unless noted otherwise, all facts are contained in the accompanying Declaration of Jeremy Halverson ("**Halverson Declaration**") and all references to Exhibits are Exhibits attached to the Halverson Declaration.

executed a Mortgage Term Loan Agreement dated April 20, 2017 ("**First Loan Agreement**") [Exhibit A]. Beeche further executed a Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 ("**First Mortgage**") which granted the Original Lender a first priority lien on certain real property located at 356 Hudson River Road, Waterford, New York 12188 (the "**Real Estate**"). [Exhibit B].

13.     Debtor leases the Real Estate from Beeche.  The fee interest in the Real Estate is not an asset of the Debtor's estate.

### The Second Loan

14.     On April 20, 2017, Beeche obtained a $1,500,000 loan ("**Second Loan**" together with the First Loan, the "**Real Estate Loans**") from the Original Lender, and in connection with this loan, executed a Construction Loan Agreement ("**Second Loan Agreement**"). [Exhibit C]  To secure this loan, Beeche executed another Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 ("**Second Mortgage**") which granted the Original Lender a second lien against the Real Estate. [Exhibit D]

### The Third Loan

15.     On April 20, 2017, Debtor obtained from the Original Lender a line of credit in the amount of $4,000,000 and a term loan in the amount of $1,350,000 (collectively the "**Third Loan**").  In connection with these financings, Debtor executed a Loan Agreement dated April 20, 2017 ("**Third Loan Agreement**"). [Exhibit E]  Debtor also executed a Security Agreement dated April 13, 2017 which granted the Original Lender a first lien on all business assets of Debtor. [Exhibit F]  As further security for repayment of the Third Loan, Beeche executed in favor of the Original Lender a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated on or about July 6, 2021 ("**Third Mortgage**") on the Real Estate. [Exhibit G]

### The Fourth Loan

16.    On or about November 8, 2017, Debtor duly executed and delivered that Amendment to Loan Agreement ("**Amendment to Third Loan Agreement**") to add a $2,5000,000 line of credit which converted to a term loan ("**Fourth Loan**" together with third Loan the "**Operating Company Loans**" together with the Real Estate Loans, the "**Loans**") in favor of the Original Lender. [Exhibit H]

**Guaranties by Debtor, GL and Beeche**

17.    GL personally guaranteed the payment of all Loans by the Original Lender to Beeche and Debtor. [Exhibit I]  Beeche personally guaranteed all the Loans to Debtor. [Exhibit J] Debtor personally guaranteed the payment of all Loans by the Original Lender to Beeche. [Exhibit K]

**Assignment of all Loans by Original Lender to Secured Creditor**

18.    On June 2, 2025, the Original Lender assigned all its rights under the Loans to the Secured Creditor. [Exhibit L]

**Collateral and Loan Balances**

19.    The assets of the Debtor which constitute the Secured Creditor's collateral are (i) accounts receivable, and (ii) all personal property which consists of scaffolding, equipment, cranes, hoisting equipment, machine shop equipment, forklifts and trucks.

20.    The Secured Creditor holds a first perfected lien on all business assets of the Debtor [Exhibit S]

21.    The balance of the Loans (excluding legal fees and costs)  as of October 14, 2025 totals **$11,760,774.20** and is broken down as follows:

· **First Loan**: $2,724,633.17
· **Second Loan**: $830,920.82
· **Third Loan**: $397,324.06
· **Fourth Loan**: $7,807,896.10

**<u>Prior to the Petition Date, Debtor's Financial Condition Deteriorates</u>**

22.    Debtor has not produced audited financial statements covering any time frame after December 31, 2022. [Exhibit M]  For the fiscal years 2023 and 2024, Debtor has only provided internally prepared financial statements. [Exhibits N and O]  The information contained in those statements is disturbing.

23.    For the fiscal year ending December 31, 2022, Debtor reported gross revenues of $14,520,584, operating expenses of $2,227,061 and positive net income of $772,891.  [Exhibit M] In 2023, however, there was a steep decline in performance.  Debtor reported lower revenues of $10,113,653 (a devastating decline from the prior year of around $4,406,931 which equates to a 30.03% decline), higher operating expenses of $6,477,315 (a staggering increase of $4,250,254 which equates to a 190.85% increase) and a **<u>net loss of $6,569,572</u>** (compared to the prior year, a swing downward of $5,796,681 which equates to a 949.8% decrease in net income).  [Exhibit N] The situation is even more bleak than the numbers appear because Debtor failed to make any payments on the Operating Company Loans after they matured on September 23, 2023.  Had those debt service payments been made after September 23, 2023, the operating losses would have been even higher.

24.    The Debtor reported another dismal financial performance in 2024. Debtor reported a further decrease in revenues ($9,899,199), high operating expenses of $6,450,795 (still approximately $4.2 million higher than the operating expenses in 2022) and another **<u>net loss of $3,552,365</u>**. [Exhibit O]  Again, the actual economics are bleaker than what was reported because Debtor failed to make any debt service payments to the Original Lender in 2024.  Had those payments been made, the financial losses would have been even higher.  In fact, Debtor has now missed over $900,000 in interest payments on the Operating Company Loans in 2023, 2024 and 2025.

25.     There are other disturbing facts about the Debtor's financial dealings.  For example, in the 2023 financial statements, Debtor show a debt owed to Debtor from a "related party" in the amount of $36,996,598.  Then that debt appears to have been mysteriously written off with an "elimination entry." [Exhibit N]  This seems to indicate that some type of insider debt was forgiven. Yet Debtor will not provide any details about this transaction.

26.     As another example, Debtor disclosed to Secured Creditor that it has over $1 million in unpaid payroll on its books.  Debtor will not provide details on these alleged unpaid wages.

27.     On the Real Estate front, Beeche is either up to no good or is similarly cash strapped.  Beeche failed to pay $407,139.24 property taxes on the Real Estate in 2023, 2024 and 2025.  The Real Estate is now on tax foreclosure status with the county.  These tax liens are damaging to Secured Creditor's interest in the Real Estate because a tax lien primes the Secured Creditor's mortgages on the Real Estate.  Furthermore, if a tax foreclosure takes place, the Secured Creditor's mortgages will be extinguished.

28.      As a further indication of Beeche's unsustainable financial crisis, Beeche stopped making payments on the Real Estate Loans in June of 2025.

**Pre-Petition Judgments**

29.     On July 12, 2024, judgment creditor 49-47 31st Street, LLC entered a confession of judgment against the Debtor, GL and Beeche in the New York State Supreme Court, Saratoga County, under Index Number EF20242218 in the amount of $1,235,225. [Exhibit P]  On July 31, 2024, judgment creditor William J. Cade entered a confession of judgment against Beeche in the New York State Supreme Court, Saratoga County, under Index Number EF20242275 in the amount of 1,602,225 (both judgments, the "**Judgments**"). [Exhibit Q]

30. The Judgments are now liens against the substantial personal real estate holdings of Beeche.

**Debtor's Lack of Transparency Pre-Petition**

31. In 2025, the financial situation of the Debtor became so harrowing that Debtor refused to provide any financial statements and other important information to the Secured Creditor. For example, on June 13, 2025, the Secured Creditor requested that Debtor provide the following standard accounting information which should be readily available and, in any event, must be disclosed to the Secured Creditor pursuant to the terms of the Loan Documents:

- 13-week cash flow forecast

- 2025 detailed budget

- Trailing 12-month operating statements

- Updated contract backlog report including deposit amounts for work not yet completed

- Debt schedule, including current balances, maturity dates, payment amounts and delinquency status

- Equipment schedule

- Inventory schedule

- Payroll arrearages

- Accounts receivable and accounts payable agings

- List of pending litigation

- List of known judgments including the amounts and parties owed

32. Despite initially promising to deliver this information, the Debtor failed to provide Secured Creditor with even one of these requested items.

**Missing and Unaccounted for Equipment Pre-Petition**

33.     As of December 31, 2023, the Debtor alleges in financial statements that Debtor owned equipment with a book value of $13,787,2289.  However, when the Original Lender sent an appraiser out to verify this equipment in April of 2024, the appraiser only found equipment with an orderly liquidation value of $2,080,060 on site. [Exhibit R]  The appraiser asked for a more complete equipment list and the locations of that equipment, and the Debtor refused to provide this information.  This lack of transparency of the Debtor raises some hard questions about whether the Debtor has falsified its financial statements or has been secreting assets.

**June  2025 Liquidity Crisis.**

34.     In early June of 2025, Secured Creditor and Debtor participated in a telephone call during which Debtor disclosed that Debtor was running out of cash and was about to shut its doors in approximately 90 days.  Moreover, Debtor advised that there were not enough cash flows in the company to even file a Chapter 11 bankruptcy case or hire an investment banker to run a sale process.  Debtor stated that the only hope for Debtor as a going concern was to complete a sale to an interested third-party buyer ("**Interested Buyer**") on an emergency basis as soon as possible.

35.     Within days, at Debtor's request, Secured Creditor scheduled a call with the Interested Buyer and its counsel.  During that call, the Interested Buyer said that it was nowhere close to proposing a letter of intent or closing a sale transaction with the Debtor.  In fact, the Interested Buyer explained that it had requested financial information from the Debtor and, despite the desperate financial straits of Debtor, Debtor had not yet provided any of the requested financial information.  The Interested Buyer's assertions surprised the Secured Creditor.  Debtor had identified an insuperable liquidity crisis, yet Debtor was not taking responsible steps to pursue a sale.

**Pre-Petition Defaults under the Loan Documents**

36.     Debtor is  in default under the terms and conditions of the Loan Documents as a result of, among other things, (a) Debtor's failure to pay all amounts due under the Third and Fourth Loans by the maturity date of September 30, 2023 as required under Section 9.1 of the Third Loan Agreement and the Fourth Loan Agreement; (b) Debtor's failure to comply with Section 7.5 Basic Fix Charge Coverage Ratio for the periods ending on March 31, 2023 and June 30, 2023 under the Third Loan Agreement; (c) the Maturity Defaults and Covenant Default constitute an event of default under the Section 8.4 of the First Loan Agreement and an event of default under Section 10.1(d) of the Second Loan Agreement;  (d) Beeche's failure to pay taxes on the Real Property for tax years 2023, 2024, and 2025 as required under Sections 8.3 and 8.4 of the First Loan Agreement, Sections 10.1(c) and (d) under the Second Loan Agreement, and Section 9.4 of the Third Loan Agreement; and (e) Beeche's failure to make any of the debt service payments as of June 2025 under the First Loan and Second Loan.

**Pre-Petition Receivership Action**

37.     On July 17, 2025, the Secured Creditor commenced an action against Debtor, Beeche and GL in the United States District Court for the Northern District of New York to foreclose on all its collateral and obtain money judgments.  The action is entitled *McCormick 103, LLC v. Greg Beeche, Logistics, LLC, Greg Logistics, LLC*, *and Gregory Beeche* and was filed under case number 1:25-cv-00944 ("**Receivership Action**").

38.     On July 18, 2025, Secured Creditor filed an emergency motion to appoint a receiver.

39.     On July 31, 2025, Beeche filed a petition for relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of New York under Case No. 25-10879 ("**Beeche Bankruptcy Case**").[2]

40.     In response to the Beeche Bankruptcy Case, on August 6, 2025, the Secured Creditor amended its complaint in the Receivership Action and removed Beeche as a defendant.

41.     On August 8, 2025, the District Court entered an order appointing Dotan Melech as receiver over all the assets and operations of the Debtor and GL ("**Receiver**").  [Melech Decl. Ex. A. at 14].

42.     In the Receivership Order, the District Court determined that the Debtor was "at or near insolvency."  [Melech Decl. Ex. A. at 14][3].

43.     Pursuant to the Receivership Order, the Receiver was appointed with broad authority to take possession, custody, and control of all assets of the Debtor, including, but not limited to, cash, receivables, equipment, inventory, contracts, intellectual property, and related records ("**Receivership Assets**").  [*Id.*]

**The Receiver's Initial Inventory and Liabilities Report**

44.     On September 2, 2025, the Receiver filed his Inventory and Liabilities Report in the Receivership Action.  [Melech Decl. Ex. B].

45.     In this report, the Receiver noted that "the Receivership Entities are not in a position to sustain ongoing operations.  Insurance coverage has lapsed, the workforce has diminished with employees unpaid for several months, and there is no cash flow to support payroll, insurance, or other operating expenses."  [*Id*. at 8].

---

[2]  On August 29, 2025, McCormick filed a motion to dismiss the Beeche Bankruptcy Case on the basis that Beeche does not quality to be a Chapter 13 debtor.  The Bankruptcy Court granted this motion on October 28, 2025, but stayed the dismissal for 14 days.

[3] The "**Melech  Decl.**" is the Declaration of the Receiver Dotan Y. Melech dated October 29, 2025.

46.     With respect to insurance specifically, the Receiver confirmed that "the absence of active insurance coverage while projects are ongoing . . . presents a substantial liability exposure to the Receivership Estate.  An immediate resolution will be required—either by bringing existing policies current or by securing alternative coverage.  If coverage cannot be restored promptly, the Receiver may have no choice but to suspend operations, including active contracts, to avoid compounding the Receivership Estate's exposure."  [*Id*].

47.     The Receiver also identified a number of improper transfers from Debtor's bank account after the Receivership Order was entered, including a $50,000 wire transfer to Beeche individually on August 13, 2025.  [*Id*. at 4].

48.     Given these issues, the Receiver's preliminary recommendation was to pursue an expedited and orderly liquidation of the Receivership Entities as a going concern, or alternatively, liquidation through asset sale(s).  [*Id*].

**Disturbing Examples of Pre-Petition Mismanagement and Failure to Protect Collateral**

49.     In August of 2025, the Receiver and a representative of the Secured Creditor met with Beeche to discuss one of the large projects Debtor had been working on called the MARTA contract.  Debtor was supposed to receive $9 million under that contract in 2025.

50.     At the meeting, Beeche confessed that the general contractor Skansa terminated Debtor earlier in 2025 because Skansa lost confidence in Debtor and its ability to perform.  To settle with Skansa, Debtor simply gave all the equipment and scaffolding it had on site to Skansa. In effect, Debtor was paying for its poor performance by giving away the Secured Creditor's collateral.

51.     During the same meeting, Beeche admitted that he was offering substantial discounts to customers for completed work in order to collect outstanding accounts receivable.

52.     Furthermore, Beeche said that most of the jobs that Debtor was then working on *were not based on* any *written agreements*.  Beeche *only had verbal agreements* the with most of its customers and Beeche claimed *this is historically how he ran his business*  In fact, only 3 of the 9 projects that were open at the time were based on written contracts.  Needless to say, to conduct a construction business based largely on verbal agreements is gross negligence of the highest degree.

**The Receiver's Supplemental Report and Emergency Notice**

53.     On September 10, 2025, the Receiver filed his Supplemental Report and Emergency Notice in the Receivership Action.  [Melech Decl. Ex. C].

54.     In this report, the Receiver identified four material concerns that made continued operation impractical, and on this basis ceased Debtor's operations, *viz.*:

a.      The Debtor had no active insurance coverage.

b.      The Receiver could not confirm that the Debtor's customer contracts were being reliably performed *because employees were not paid for several months* and only limited personnel remained available.

c.      The Debtor had no liquidity and no certainty of collections.

d.      All key managers, including the last project supervisor, departed, leaving only a small number of part-time personnel who were inadequate to perform ongoing projects.  As a result, the Debtor's workforce and management structure were no longer sufficient to sustain operations.  In addition, employees and union obligations remained substantially in arrears, and payroll exposure under state labor law continued to grow without any available funds to satisfy it.[4]

[*Id*. at 1-3].

---

[4]  On September 22, 2025, Local Union 580 filed a proof of claim in the Beeche Bankruptcy Case (Claim No. 9) in the amount of $1,488,639.00 as a result of the Debtor's unpaid fringe benefit contributions for services performed by members of Local Union 580.

55.     Therefore, the Receiver noted that the only realistic plan for the Debtor consisted of (i) freezing all expenses while earned revenues (excluding deposits) are collected, (ii) ceasing all operations immediately with notice provided to the District Court, employees, and customers, and (iii) focusing all efforts on liquidating the Debtor's assets, whether in one sale or in pieces, the proceeds of which would then be distributed to creditors.  [*Id*. at 3].

**The Receiver's Interim Status Report and Beeche Destroys Potential Settlement**

56.     On October 24, 2025, the Receiver filed his Interim Status Report.  [Melech Decl. Ex. D].

57.     In this report, the Receiver detailed, among other things, his effort to facilitate a global resolution with the Secured Creditor and Beeche in September 2025, which would have benefitted the Receivership Estate. [*Id*. at 3].

58.     Indeed, after significant effort, Beeche agreed in writing to the following material terms of settlement on September 22, 2025:

    a.     Beeche shall immediately dismiss his Ch. 13 bankruptcy case (Case No. 25-10879 (NDNY)).

    b.     Beeche shall immediately surrender to the Receiver possession of the Porsche, VIN WP0BC2A75EL077136, titled in Greg Beeche, Logistics, LLC.

    c.     Beeche shall intervene in the receivership action (Civ. Action No. 25-00944 (NDNY)) solely to the extent of his ownership of (i) the Real Estate and (ii) all patents and other intellectual property utilized in connection with the operation Debtor and GL, and such property shall become assets of the receivership estate.

    d.     To the extent necessary,  Beeche consents to, and shall in every way cooperate with, the Receiver's sale and/or Secured Creditor's disposition of all assets of the receivership estate, including, but not limited to, those assets set forth in the. . . letter of intent dated as of September 18, 2025.

      e.      On the express condition that items 1-4 are fully satisfied, Secured Creditor shall release Beeche from personal liability on any debt owed to Secured Creditor.

[*Id.*].

59.     These material terms of settlement followed the Receiver's receipt of a letter of intent from the Interested Buyer in purchasing the Receivership Assets and Real Estate, and this letter of intent was referenced in the material terms of settlement. [*See id.*] The Interested Buyer was willing to pay $5 million for the Debtor's assets and $5 million for the Real Estate owned by Beeche and not the Debtor. Although this purchase price was less than the $11,760,774.20 secured claim of the Secured Creditor, the Secured Creditor was willing to release its liens at this price.

60.     In reliance on Beeche's consent to these material terms of settlement, on September 24, 2025, the Receiver negotiated and entered into a non-binding letter of intent with the Interested Buyer. [Melech Decl. Ex. D at 3].

61.     Unfortunately, despite Beeche's consent to the material terms of settlement with the Secured Creditor, Beeche refused to honor this agreement and execute a formal agreement, which impacted the Receiver's ability to pursue a potential sale to the Interested Buyer. [*Id.* at 7].

62.     At the last minute before signing a Settlement Agreement, Beeche demanded that the Secured Creditor pay off all the Judgments as part of any settlement. Beeche's demand to pay nearly $3 million in Judgments which are junior liens on Beeche's personal residences was totally unreasonable and self-serving.

**Beeche Obstructs and Harasses the Receiver**

63.     Beyond Beeche's failure to keep his agreement, the Receiver, in his Interim Status Report, also detailed other forms of Beeche's ongoing interference with the Receiver's administration of the Receivership Estate. [*Id.* at 5-7].

64.    For example, in emails and text messages to the Receiver, Beeche (i) demanded that the Receiver cover the payment of all payroll (even though there were insufficient funds to do so), (ii) demanded that the Receiver allow Debtor to "live on" while recognizing that the Interested Buyer was going to make an offer to purchase the Receivership Assets, and (iii) called the receivership process "an abomination." [*Id*. at 6].

65.    In addition, on September 11, 2025—a month after the Receivership Order was entered—Beeche appeared in the Town of Halfmoon (New York) Justice Court before the Honorable Katherine Suchocki and purported to enter into a "So Ordered" Stipulation of Settlement as Debtor's "Member, Manager, Owner" obligating Debtor to pay $2,750 to a former employee without the approval of, or any notice to, the Receiver. [*Id*. at 6].

66.    Beeche also communicated directly with the Interested Buyer on October 1, 2025, in writing, in which he referred to the Receiver as a criminal and suggested that the Interested Buyer should not engage in further discussions with the Receiver. [*Id*. at 6-7].

67.    Finally, Beeche initiated unauthorized transfers totaling approximately $74,000 from the Debtor's operating account—including a $50,000 wire to himself—after the Receivership Order was entered. [*Id*. at 7].

68.    As discussed below, the Debtor has no operations, no employees, no current projects, no liquidity and no possible path forward to reorganize.

## IV.    <u>ARGUMENT</u>

**The Case Should be Dismissed**

69.    "Under 11 U.S.C. § 1112(b), a bankruptcy court may dismiss a chapter 11 petition if the party moving for dismissal can establish cause." *Squires Motel, LLC v. Gance*, 426 B.R. 29, 34 (N.D.N.Y. 2010).   "In addition to the non-exhaustive list of examples enumerated in §

1112(b)(4), cause for dismissal may exist where a chapter 11 petition is filed in bad faith." *Squires Motel, LLC*, 426 B.R. at 34.

70.    "To establish bad faith, the movant must satisfy a two-pronged test by a preponderance of the evidence. First, the movant must demonstrate the objective futility of the reorganization process such that at the time of filing there was "no reasonable probability that [the debtor] would eventually emerge from bankruptcy proceedings." *Id.* (internal quotations and citations omitted). "Second, in demonstrating subjective bad faith, the movant must show that there was no reasonable likelihood that the debtor intended to reorganize. *Id.* (internal quotations and citations omitted). "Once the movant has met both the objective and subjective prongs, a rebuttable presumption of bad faith arises and the burden shifts to the debtor to establish good and sufficient reasons why the relief should not be granted." *Id.* (internal quotations and citations omitted). "In other words, the debtor must demonstrate that unusual circumstances exist establishing that dismissal is not in the best interests of creditors and the estate. *Id.* at 34-35.

**The Debtor's Subjective Bad Faith in Filing a Chapter 11 Case**

71.    "[A] determination of bad faith requires a full examination of all the circumstances of the case; it is a highly factual determination but also one that may sweep broadly." *Id.* at 35 (internal quotations and citations omitted).

72.    "In making this determination, the following factors should be considered as they may be indicative of a bad faith filing: (1) the nature and extent of the debtor's assets and debts; (2) the extent of the debtor's business operations, including amount of employees, cash flow, and current expenses; (3) the extent to which the debtor's financial condition is essentially a two party dispute between the debtor and secured creditors; (4) whether the debtor has few unsecured creditors whose claims are small compared to the secured creditors' claims; (5) whether there is a reasonable probability that a reorganization plan can be proposed and confirmed; (6) whether the

timing of the debtor's filing evidences an intent to gain a litigation advantage or to delay or frustrate its secured creditors' efforts to enforce their rights; and (7) the nature of the property transfer — whether it involved distressed real property into a newly created entity, whether it occurred within close proximity to the filing of the bankruptcy case, and the amount of consideration paid for the property other than stock in the debtor." *Id*; *also Neilson v. Estate of Benedict*, No. 1:18-CV-1101, 2020 U.S. Dist LEXIS 39901, 2020 WL 1140493 (N.D.N.Y. Mar. 09, 2020). "[T]he subjective bad faith standard is meant to insure that the Debtor actually intends to use chapter 11 to reorganize and rehabilitate itself and not simply to cause hardship or delay to its creditors by invoking the automatic stay." *In re Consol. Distribs., Inc.*, No. 13-40350 (NHL), 2013 Bankr LEXIS 3101, 2013 WL 3929851, at *8 (Bankr. E.D.N.Y. July 23, 2013).

73.     Here, all these factors point to subjective bad faith.

74.     **Debtor's Assets and Liabilities**.  The liabilities of the Debtor dwarf its assets. There is no possibility of the Debtor being sold as a going concern, and so its assets need to be valued on a liquidation basis.  In that regard, the appraised value of the assets is approximately $2 million (though the appraiser did note that some equipment may not have been on site for the appraisal).  The better data point is the purchase price offered by the Interested Buyer.  The Interested Buyer is only willing to pay $5 million for Debtor's assets.

75.     By contrast, the Debtor owes its only Secured Creditor at least $11.7 million which means the Secured Creditor is under water by at least  $6.7 million.  Other known unsecured claims include the claim of a union for approximately $1.5 million and the Judgments for approximately $3 million.  Debtor's liabilities far outstrip its debts.

76.    **Debtor's Operations**.  The Debtor has no operations.  The Debtor no longer operates as a going concern and has not done so for almost two months.  The Debtor currently has no employees or customers.  This means the Debtor has no potential to earn revenue going forward.

77.    The Debtor does not have enough capital to resume operations.  The Debtor has no DIP financing to support new operations.  The Debtor is not permitted to use cash collateral.  The Secured Creditor does not consent to the use of any cash collateral, and the Debtor has no means to provide any adequate protection for the use of that cash collateral.

78.    It would not even make sense for the Debtor to resume operations.  Prior to the receivership, the Debtor was not profitable.  In 2023, the Debtor lost $6,569,572.  In 2024, the Debtor lost $3,532,365.  In 2025, the Debtor refused to disclose its losses.  The Debtor has not made a loan payment to its senior secured lender for two years.  Prior to the receivership, the Debtor was unable to pay employees for 4 months or pay for insurance.  The Debtor simply has no financial ability to reorganize or operate.

79.    **Two-Party Dispute**.  The dispute between the Secured Creditor and the Debtor is the sole reason for the bankruptcy filing.  Debtor only filed for bankruptcy in response to the Receivership Action and to thwart the Receiver's efforts to sell Debtor's assets.  Only the Secured Creditor is going to make a recovery on its collateral and therefore the two-party dispute between the Debtor and the Secured Creditor should be resolved in the Receivership Action, not the Bankruptcy Court.

80.    **Secured Claims Dwarf Unsecured Claims**.  As noted above, the Secured Creditor's claims are over $11.7 million and greatly exceed the value of the Debtor's assets by a staggering $6.7 million.  The only creditor who stands to have a recovery against the Debtor's

assets is the Secured Creditor.  By contrast, the only known unsecured claims are around $1.5 million for a union and $3 million for judgment creditors.

81.    **No Reasonable Probability for Reorganization**.  The Debtor cannot resume operations and reorganize.  The Debtor's capital structure is inadequate.  The Debtor has no DIP financing and no ability to use cash collateral.

82.    Aside from this, there is a material execution risk in any reorganization effort because current management is grossly incompetent.  For example, Beeche admitted that he operated a construction company without written agreements on most of his projects.  That is grossly irresponsible.  As another example, Debtor was fired from its largest project in 2025 due to a failure to perform and then gave away the Secured Creditor's collateral to pay for the damage caused by the Debtor's non-performance.

83.    Beeche has diverted funds for his own personal benefit including $50,000 of cash in the receivership bank account and the Debtor's SoFA fails to disclose any preference payments made to Beeche within the last year..

84.    Beeche has a total conflict of interest.  He refused recently to cooperate in the sale of the Debtor's assets unless the Secured Creditor paid off $3 million in judgment liens which have attached to Beeche's two personal residences.  Beeche is only out to protect Beeche.  He will not protect the interests of Debtor or its creditors.  There is no way the Debtor can reorganize with such a self-seeking manager at the helm

85.    **The Debtor has no earning power**.  The Debtor has stopped operating.  The Debtor has no potential to earn revenues.  There is no profitable business to resuscitate.  The Debtor experienced sustained and persistent operating losses of more than $10 million prior to the bankruptcy filing.  There is simply no profitable business to save through a reorganization.

86.    **Timing of the Bankruptcy Filing**.  Beeche timed this irresponsible and hopeless Chapter 11 filing solely to frustrate the collection efforts of the Secured Creditor.  Beeche never filed the bankruptcy before the Receivership Action and waited over two months into the receivership to file the bankruptcy petition for the Debtor.  And Beeche only filed the petition after the Secured Creditor refused to pay off $3 million of judgment liens on Beeche's personal residences.

87.    **Pre-Petition Property Transfers**.  The Debtor admitted to transferring valuable equipment on the MARTA project to a general contractor to pay for the Debtor's defective work.  In addition, Beeche transferred to himself $50,000 of receivership money.  These shady transactions further evidence that Beeche is only out to protect his own personal interests rather than the interests of creditors.

88.    For all these reasons, the Debtor has subjectively and intentionally acted in bad faith with this Chapter 11 filing.

**The Debtor's Reorganization is Objectively Futile**

89.    A determination of "objective futility" focuses on whether a reorganization is realistically possible.  *In re 167 West 133rd St. Hous. Dev. Fund Corp.*, 2018 WL 4637460 at *8 (Bankr. S.D.N.Y. Sept. 25, 2018)  "The objective futility standard 'is designed to ensure that the debtor actually has a potentially viable business in place to protect and rehabilitate.  Lacking this, the chapter 11 case has lost its *raison d'être*."'  *In re Artisanal 2015, LLC*, 2017 WL 5125545, at *9 (Bankr. S.D.N.Y. Nov. 3, 2017); *see also In re Rubin Fam. Irrevocable Stock Trust*, 2013 WL 6155606, at *14 (Bankr. E.D.N.Y. Nov. 21, 2013) ("'Objective futility' is met where there is no reasonable possibility of a prompt, successful reorganization or no real need for one.").

90.    Given the circumstances underlying this Case, no reorganization of the Debtor is realistically possible. As discussed above at length, the Debtor has no capital structure to support operations.  The Debtor has no revenue stream because it has ceased operations and was wildly unprofitable for three years prior to the bankruptcy filing.  It is impossible for the Debtor to reorganize under these circumstances.

**The Court Should Excuse The Receiver's Compliance With 11 U.S.C. § 543(A)-(C)**

91.    The Secured Creditor sincerely hopes that the Court will dismiss this bankruptcy case as a bad faith filing.  Nevertheless, in the alternative, the Secured Creditor respectfully requests that the Receiver remain in place.

92.    Code Section 543(b) provides that:

> A custodian shall (1) deliver to the trustee any property of the debtor transferred to such custodian, or proceeds of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and (2) file an accounting of any property of the debtor, or proceeds of such property that, at any time, came into the possession, custody, or control of such custodian.

11 U.S.C.  § 543(d).

93.    A court appointed receiver is a "custodian" within the meaning of Code § 101(11). *In re Pyramid Auto Grp., Inc.*, No. 04-69021, p.7 (Bankr. N.D.N.Y. Oct. 26, 2005) "Therefore, once a bankruptcy petition is filed, a nonbankruptcy custodian's receivership terminates and the custodian must, as a general proposition, deliver the debtor's property to the trustee or the debtor, and must account for the properties which were in the custodian's possession, custody, or control as a custodian." *Id.*

94.    While turnover is the general rule, Code § 543(d) provides an exception to this requirement. Code Section 543(d) provides that:

> (d) After notice and hearing, the bankruptcy court—

(1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property . . .

11 U.S.C. § 543(d).

95.     "Courts assess the creditors' interests by examining several factors, which have evolved to include: (1) whether there will be sufficient income to fund a successful reorganization; (2) whether the debtor will use the property for the benefit of the creditors; (3) whether there were instances of mismanagement by the debtor; and (4) whether there are preferences which a receiver is not empowered to avoid (because a receiver does not possess avoiding powers for the benefit of the estate)." *In re Pyramid Auto Grp., Inc.*, No. 04-69021, at p.8; *also In re Dill*, 163 B.R. 221, 225-227 (E.D.N.Y. 1994). The interest of the Debtor is not a factor a bankruptcy court should consider when analyzing § 543(d)(1). *In re Pyramid Auto Grp., Inc.*, No. 04-69021, at p.7; *In re Dill*, 163 B.R. at 225.

96.     Here, all the factors decisively support the receiver remaining in place.

97.     **Insufficient Income**. The Debtor has stopped operating and has no revenue. Over the past three years the Debtor has had net operating losses which exceed $10 million.

98.     **Use of Property**. The Debtor will not use its property for the benefit of creditors. Beeche has proven repeatedly that he will not protect creditors. For example, Beeche gave the Secured Creditor's collateral away to a general contractor where Debtor failed to perform properly. In addition, Beeche paid himself personally $50,000 from the receivership account. This was a brazen conversion of corporate funds and in contempt of the receivership order. On top of all this, Beeche rejected the sale of the Debtor's assets unless the Secured Creditor paid off $3 million in judgment liens  on the Debtor's personal residences. Beeche cannot be trusted to manage and

protect the Debtor's assets.  He has a conflict of interest and has shown repeatedly that his personal interests trump the interests of creditors.

99.    **Prior Mismanagement**.  There are plenty of examples of prior mismanagement by Beeche and the Debtor.  The Debtor is in the construction business and regularly entered into verbal agreements with customers.  The Debtor did not use written agreements in the ordinary course.  The Debtor failed to pay employees for 4 months.  The Debtor failed to pay a union $1.4 million.  The Debtor failed to perform on a $9 million contract in 2025 and was fired from the job. The Debtor gave collateral to a general contractor to settle a debt.  Just the past few days  Beeche has cut through locks the receiver installed to protect Debtor's assets and tried to transfer equipment to one on Debtor's prior customers.  Beeche is clearly erratic and the Debtor cannot be trusted to manage or protect the Debtor's assets.

100.    **Preferences**.  The Secured Creditor is not aware of the existence of any preference claims other than preferences claims against Beeche individually.  Clearly, Beeche will not pursue preference claims against himself.   Therefore, this factor also supports the retention of the Receiver.

## V.    <u>NO PRIOR MOTION</u>

101.    The Secured Creditor  has not made any prior motion or application for the relief requested herein to this Court or to any other court and expressly reserves its rights to seek such other relief as it deems appropriate.

## VI.    <u>NOTICE</u>

102.    Notice of the Motion has been provided to the Debtor, counsel for the Debtor, all parties requesting notice, and the Office of the United States Trustee.

## VII.    <u>CONCLUSION</u>

103.    Based on the foregoing, the Secured Creditor respectfully requests that the motion

be granted and that the Court award other and further appropriate relief.

Dated:  October 29, 2025                    **BUCHANAN INGERSOLL & ROONEY PC**

By: /s/ Christopher P. Schueller
    Christopher P. Schueller
    N.Y. Bar No. 2582914
    640 5th Avenue, 9th Floor
    New York, NY  10019
    Telephone:  (212) 440-4400
    Fax:  (212) 440-4401
    E-mail: christopher.schueller@bipc.com

    *Attorneys for Secured Creditor*
    *McCormick 103, LLC*