Christopher P. Schueller, Esquire
New York Bar No. 2582914
**BUCHANAN INGERSOLL & ROONEY PC**
640 5th Avenue, 9th Floor
New York, NY  10019
Telephone:  (212) 440-4400
Fax:  (212) 440-4401
E-mail: christopher.schueller@bipc.com
*Attorneys for Secured Creditor McCormick 103, LLC*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

    GREG BEECHE, LOGISTICS, LLC,

                      Debtor.

Chapter 11

Case No. 25-11257-1-pgr

**DECLARATION OF JEREMY HALVERSON IN SUPPORT OF SECURED CREDITOR'S EMERGENCY MOTION TO DISMISS PURSUANT TO 11 U.S.C. § 1112(b), OR IN THE ALTERNATIVE, FOR RELIEF PURSUANT TO 11 U.S.C. § 543(d)**

I, **JEREMY HALVERSON**, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am a Vice President at Beltway Capital Management, LLC, authorized agent and servicer for McCormick 103, LLC ("**Secured Creditor**").  I am fully familiar with the facts and circumstances hereinafter recited.  I make this Declaration in support of the Secured Creditor's Emergency Motion ("**Motion**") to Dismiss Pursuant to 11 U.S.C. § 1112(b) Based on a Bad Faith Filing, or in the Alternative, to Excuse the Turnover of Assets by the Receiver Pursuant to 11 U.S.C. § 543(d).

2. As to the facts in this Declaration I know them to be true of my own knowledge, from my review of the business records of the Secured Creditor which have been made available

to me. All such business records were created and/or maintained in the course of the Secured Creditor's business and in accordance with normal business practices. If called upon to testify as to the matters set forth in this Declaration, I could and would competently testify thereto, since the facts set forth herein are known to me to be true. As to those matters stated in this Declaration on information and belief, I believe them to be true.

3. Debtor Greg Beeche, Logistics, LLC ("**Debtor**") (www.gregbeeche.com) is no longer in business. Prior to closing, the Debtor was a construction company which designed, manufactured, delivered, erected, supervised, used, and then dismantled its adaptable, modular scaffolding and other work access systems. The company provides logistics planning, master rigging services, professional engineering services, field training and project oversight. Gregory Beeche ("**Beeche**") is the majority owner of Debtor and Greg Logistics, LLC ("**GL**"). As far as Secured Creditor can discern, GL is either a non-operating shell company or its operations are insignificant.

4. On April 20, 2017, Beeche obtained a term loan ("**First Loan**") in the amount of $3,600,000 from Bank of America, N.A. ("**Original Lender**"), and in connection with this loan executed a Mortgage Term Loan Agreement dated April 20, 2017 ("**First Loan Agreement**"). A true and accurate copy of the First Loan Agreement is attached hereto as **Exhibit A**. Beeche further executed a Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 ("**First Mortgage**") which granted the Original Lender a first priority lien on certain real property located at 356 Hudson River Road, Waterford, New York 12188 (the "**Real Estate**"). A true and accurate copy of the First Mortgage is attached hereto as **Exhibit B**.

5. On April 20, 2017, Beeche obtained a $1,500,000 loan ("**Second Loan**" together with the First Loan, the "**Real Estate Loans**") from the Original Lender, and in connection with

2

this loan, executed a Construction Loan Agreement ("**Second Loan Agreement**"). A true and accurate copy of the Second Loan Agreement is attached hereto as **Exhibit C**. To secure this loan, Beeche executed another Gap Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated April 20, 2017 ("**Second Mortgage**") which granted the Original Lender a second lien against the Real Estate. A true and accurate copy of the Second Mortgage is attached hereto as **Exhibit D**.

6. On April 20, 2017, Debtor obtained from the Original Lender a line of credit in the amount of $4,000,000 and a term loan in the amount of $1,350,000 (collectively the "**Third Loan**"). In connection with these financings, Debtor executed a Loan Agreement dated April 20, 2017 ("**Third Loan Agreement**"). A true and accurate copy of the Third Loan Agreement is attached hereto as **Exhibit E**. Debtor also executed a Security Agreement dated April 13, 2017 which granted the Original Lender a first lien on all business assets of Debtor ("**Security Agreement**"). A true and accurate copy of the Security Agreement is attached hereto as **Exhibit F**. As further security for repayment of the Third Loan, Beeche executed in favor of the Original Lender a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated on or about July 6, 2021 ("**Third Mortgage**") on the Real Estate. A true and accurate copy of the Third Mortgage is attached hereto as **Exhibit G**.

7. On or about November 8, 2017, Debtor duly executed and delivered that Amendment to Loan Agreement ("**Amendment to Third Loan Agreement**") to add a $2,5000,000 line of credit which converted to a term loan ("**Fourth Loan**" together with third Loan the "**Operating Company Loans**" together with the Real Estate Loans, the "**Loans**") in favor of the Original Lender ("**Amendment**"). A true and accurate copy of the Amendment is attached hereto as **Exhibit H**.

3

8. GL personally guaranteed the payment of all Loans by the Original Lender to Beeche and Debtor. A true and accurate copy of this guaranty dated April 20, 2017 ("**GL Guaranty**") is attached hereto as **Exhibit I**. Beeche personally guaranteed all the Loans to DEBTOR, and a true and accurate copy of this guaranty dated April 20, 2017 ("**Beeche Guaranty**") is attached hereto as **Exhibit J**. Debtor personally guaranteed all the Loans to Beeche, and a true and accurate copy of this guaranty ("**Debtor Guaranty**") is attached as **Exhibit K**.

9. On June 2, 2025, Original Lender assigned all its rights under the Loans to the Secured Creditor. A true and accurate copy of a Bill of Sale is attached as **Exhibit L**.

10. The primary collateral for the Loans falls into four general categories: (i) accounts receivable of Debtor, (ii) personal property of Debtor consisting of scaffolding, equipment, cranes, hoisting equipment, machine shop equipment, forklifts and trucks, (iii) contractual rights of Debtor to license intellectual property owned by Beeche, and (iv) the Real Estate.

11. The balance of the Loans (excluding legal fees and costs) as of October 14, 2025 totals **$11,760,774.20** and is broken down as follows:

- **First Loan**: $2,724,633.17
- **Second Loan**: $830,920.82
- **Third Loan**: $397,324.06
- **Fourth Loan**: $7,807,896.10

12. Attached as **Exhibit M** is a true and accurate copy of the Debtor's financial statements for the fiscal year ending December 31, 2022. Debtor has not produced audited financial statements covering any time frame after December 31, 2022.

13. For the fiscal years 2023 and 2024, Debtor has only provided internally prepared financial statements. True and accurate copies of these financial statements are attached hereto as **Exhibit N** and **Exhibit O**.

14. For the fiscal year ending December 31, 2022, Debtor reported gross revenues of $14,520,584, operating expenses of $2,227,061 and positive net income of $772,891. In 2023, however, there was a steep decline in performance. Debtor reported lower revenues of $10,113,653 (a decline from the prior year of around $4,406,931 which equates to a 30.03% decline), higher operating expenses of $6,477,315 (an increase of $4,250,254 which equates to a 190.85% increase) and a net loss of $6,569,572 (compared to the prior year, a swing downward of $5,796,681 which equates to a 949.8% decrease in net income). The situation is even more bleak than the numbers appear because Debtor failed to make any payments on the Operating Company Loans after they matured on September 23, 2023. Had those debt service payments been made after September 23, 2023, the operating losses would have been even higher.

15. The Debtor reported another dismal financial performance in 2024. Debtor reported a further decrease in revenues ($9,899,199), high operating expenses of $6,450,795 (still approximately $4.2 million higher than the operating expenses in 2022) and another net loss of $3,552,365. Again, the actual economics are bleaker than what was reported because Debtor failed to make any debt service payments to the Original Lender in 2024. Had those payments been made, the financial losses would have been even higher. In fact, Debtor has now missed over $1,000,000 in interest payments on the Operating Company Loans in 2023, 2024 and 2025.

16. Pre-petition, Debtor disclosed to Secured Creditor that it has over $1 million in unpaid payroll on its books. Defendants will not provide details on these alleged unpaid wages. However, the Debtor admitted that while not paying employees for over 4 months pre-petition, Debtor paid Beeche and his son an undisclosed sum each month for back unpaid wages.

17. Beeche failed to pay $407,139.24 property taxes on the Real Estate in 2023, 2024 and 2025.

5

18. Beeche stopped making payments on the Real Estate Loans in July of 2025.

19. On July 12, 2024, judgment creditor 49-47 31st Street, LLC entered a confession of judgment against Debtor, GL and Beeche in the New York State Supreme Court, Saratoga County, under Index Number EF20242218 in the amount of $1,235,225. A true and accurate copy of this judgment is attached hereto as **Exhibit P**. On July 31, 2024, judgment creditor William J. Cade entered a confession of judgment against Beeche in the New York State Supreme Court, Saratoga County, under Index Number EF20242275 in the amount of $1,602,225. A true and accurate copy of this judgment is attached hereto as **Exhibit Q**.

20. In 2025, the Debtor refused to provide any financial statements and other important information. For example, on June 13, 2025, the Secured Creditor requested that Debtor provide the following standard accounting information which should be readily available and in any event must be disclosed to the Secured Creditor pursuant to the terms of the Loan Documents:

- 13-week cash flow forecast
- 2025 detailed budget
- Trailing 12-month operating statements
- Updated contract backlog report including deposit amounts for work not yet completed
- Debt schedule, including current balances, maturity dates, payment amounts and delinquency status
- Equipment schedule
- Inventory schedule
- Payroll arrearages

- Accounts receivable and accounts payable agings

- List of pending litigation

- List of known judgments including the amounts and parties owed

21. Despite initially promising to deliver this information, the Debtor failed to provide Secured Creditor with even one of these requested items.

22. As of December 31, 2023, the Defendants allege in their financial statements that Debtor owned equipment with a book value of $13,787,2289. However, when the Original lender sent an appraiser out to verify this equipment in April of 2024, the appraiser only found equipment with an orderly liquidation value of $2,080,060 on site. A true and accurate copy of this appraisal is attached hereto as **Exhibit R**.

23. In early June of 2025, Secured Creditor and Debtor participated in a telephone call during which Debtor disclosed that Debtor was running out of cash and was about to shut its doors in approximately 90 days. Moreover, Debtor advised that there were not enough cash flows in the company to even file a Chapter 11 bankruptcy case or hire an investment banker to run a sale process. Debtor stated that the only hope for Debtor as a going concern was to complete a sale to an interested third-party buyer on an emergency basis as soon as possible. Debtor further alleged that they were in communications with such a buyer who wanted to purchase Debtor assets immediately through an emergency Chapter 7 bankruptcy proceeding.

24. Within days, at Debtor's request, Secured Creditor scheduled a call with the buyer and buyers' counsel. During that call, the buyer said that it was nowhere close to proposing a letter of intent or closing a sale transaction with the Debtor. In fact, the buyer explained that it had requested financial information from the debtor and, despite the desperate financial straits of Debtor, Debtor had not yet provided any of the requested financial information. The buyer's

7

assertions surprised the Secured Creditor. Debtor had identified an insuperable liquidity crisis, yet Debtor was not taking responsible steps to pursue a sale.

25. Debtor is in default under the terms and conditions of the Loan Documents as a result of, among other things, (a) Debtor's failure to pay all amounts due under the Third and Fourth Loans by the maturity date of September 30, 2023 as required under Section 9.1 of the Third Loan Agreement and the Fourth Loan Agreement; (b) Debtor's failure to comply with Section 7.5 Basic Fixed Charge Coverage Ratio for the periods ending on March 31, 2023 and June 30, 2023 under the Third Loan Agreement; (c) the Maturity Defaults and Covenant Default constitute an event of default under the Section 8.4 of the First Loan Agreement and an event of default under Section 10.1(d) of the Second Loan Agreement; (d) Beeche's failure to pay taxes on the Real Property for tax years 2023, 2024, and 2025 as required under Sections 8.3 and 8.4 of the First Loan Agreement, Sections 10.1(c) and (d) under the Second Loan Agreement, and Section 9.4 of the Third Loan Agreement; and (e) Beeche's failure to make any of the debt service payments as of June 2025 under the First Loan and Second Loan.

26. Attached as **Exhibit S** is a true and accurate lien search which confirms that the Secured Creditor is the only creditor with a lien on the assets of the Debtor.

27. In August of 2025, the Receiver Dotan Y. Melech ("**Receiver**") and I met with Beeche to discuss one of the large projects Debtor had been working on called the MARTA contract. Debtor was supposed to receive $9 million under that contract.

28. At the meeting, Beeche confessed that the general contractor Skansa terminated Debtor earlier in 2025 because Skansa lost confidence in Debtor and its ability to perform. To settle with Skansa, Debtor simply gave all the equipment and scaffolding it had on site to Skansa. In effect, Debtor was paying for its poor performance by giving away the Secured Creditor's collateral.

8

29. During the same meeting, Beeche admitted that he was offering substantial discounts to customers for completed work in order to collect outstanding accounts receivable.

30. Furthermore, in a true stunner, Beeche said that most of the jobs that Debtor was then working on were not based on any written agreements. Beeche only had verbal agreements with most of its customers and Beeche claimed this is historically how he ran his business He was only aware of written contracts for 3 of the 9 open projects at the time. Needless to say, to conduct a construction business based largely on verbal agreements is gross negligence of the highest degree.

Dated: October 29, 2025

_____
Jeremy Halverson

4899-5639-3590, v. 1

9