# Exhibit A



United States of America
## OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION
1120 20th Street, N.W., Ninth Floor
Washington, DC 20036-3457

Phone: (202) 606-5405                                               Fax: (202) 606-5409

# Notice of Decision

**In Reference To:**

**Secretary of Labor v.** GREG BEECHE LOGISTICS
**OSHRC Docket No**.      21-1262

1. Enclosed is a copy of my decision. The entire record, including this decision, shall constitute the report of this Administrative Law Judge pursuant to section 12(j) of the Occupational Safety and Health Act of 1970 (the Act), 29 U.S.C. § 661(j). The Judge's report, which includes this decision, will be filed with the Commission's Executive Secretary on **December 23, 2024.** *See* Commission Rule 90(b), 29 C.F.R. § 2200.90(b). The Executive Secretary will then issue a "Notice of Docketing of Administrative Law Judge's Decision" that notifies all parties of the date that the Executive Secretary dockets the Judge's report, and that will state the date by which a party must file a petition for discretionary review.

2. *Commission final order.* The decision shall become a final order of the Commission thirty (30) days from the date the Executive Secretary dockets the decision, unless a Commission member directs review of the Decision within that time. *See* Section 12(j) of the Act; Commission Rule 90(f), 29 C.F.R. § 2200.90(f).

3. *Party adversely affected or aggrieved by the decision.* A party adversely affected or aggrieved by the decision of the Judge may seek review by the Commission by filing a petition for discretionary review with the Executive Secretary at any time following the service of the Judge's decision on the parties but no later than 20 days after the date of docketing of the Judge's report. *See* Commission Rule 91(b), 29 C.F.R. § 2200.91(b). The Executive Secretary's address is as follows:

   > **Executive Secretary**
   > **Occupational Safety and Health Review Commission**
   > **One Lafayette Centre**
   > **1120 20th Street NW, Suite 980**
   > **Washington, D.C. 20036-3457**

   The full text of the rule governing the filing of a petition for discretionary review is Commission Rule 91, 29 C.F.R. § 2200.91.

4. *Correction of errors in the Judge's report.* Up to the time that either the Commission directs review of the decision or the decision becomes a final order of the Commission, a request to correct clerical errors arising through oversight or inadvertence in the decision or in other parts

of the Judge's report shall be filed with the undersigned Judge, by motion, pursuant to Commission Rule 90(b)(4)(i), 29 C.F.R. § 2200.90(b)(4)(i).   Motions shall conform to Commission Rule 40, 29 C.F.R. § 2200.40.

5. *Relief from default.*  Requests for relief from default or for reinstatement of the proceeding may be filed with the undersigned Judge, by motion, until the date the Executive Secretary dockets the Judge's report.  *See* Commission Rule 90(c), 29 C.F.R. § 2200.90(c).  Motions shall conform to Commission Rule 40, 29 C.F.R. § 2200.40.

6. *Filing with Executive Secretary.*  Except for motions filed to correct errors in the Judge's report discussed in paragraph 4 above, on or after the date the Executive Secretary dockets the Judge's report, all documents shall be filed with the Executive Secretary.  *See* Commission Rule 90(d), 29 C.F.R. § 2200.90(d).

 */s/ William S. Coleman*
WILLIAM S. COLEMAN
Administrative Law Judge, OSHRC

Dated: December 10, 2024

2



United States of America
**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**
1120 20th Street, N.W., Ninth Floor
Washington, DC 20036-3457

SECRETARY OF LABOR,

        Complainant,

            v.

GREG BEECHE LOGISTICS,

        Respondent.

Docket No. 21-1262

## DECISION AND ORDER

APPEARANCES:

    For the Complainant:

        Paul Spanos, Senior Trial Attorney
        Sarah D. Margulies, Trial Attorney
        Office of the Solicitor
        U.S. Department of Labor
        Boston, Massachusetts

    For the Respondent:

        Robert S. Wolfe, Esquire
        Robert Wolfe Associates
        Gloucester, Massachusetts

BEFORE:   William S. Coleman
           Administrative Law Judge

## INTRODUCTION

The Respondent, Greg Beeche Logistics (GBL), designs, fabricates, installs, and maintains suspension scaffolds that are used in construction projects on high-rise buildings.

In 2020 and 2021, GBL provided several two-point adjustable suspension scaffolds for a project to remove and replace the exterior curtain wall panels on a high-rise building in Boston, Massachusetts. The Occupational Safety and Health Administration (OSHA) received an

anonymous complaint that the suspension scaffolds had inadequate fall protection.  (Ex. R-2; T. 90-91, 122).  In response to that complaint, on April 30, 2021, OSHA dispatched one of its compliance safety and health officers to the construction site to conduct an inspection.  (T. 91).

As a result of OSHA's inspection and investigation, OSHA issued to GBL a Citation and Notification of Penalty (Citation) that alleged one serious violation of OSHA's scaffolds standard codified at 29 C.F.R. Part 1926, subpart L [§§ 1926.450–.454].  OSHA cited GBL for violating § 1926.451(g)(3)(iii) of the scaffolds standard, which requires two-point adjustable suspension scaffolds to "be equipped with additional independent support lines and automatic locking devices capable of stopping the fall of the scaffold in the event one or both of the suspension ropes fail." Section 1926.451(g)(3)(iii) specifies further that the additional independent support lines "shall be equal in number and strength to the suspension ropes." [1]  *Id.*

The Citation alleged that GBL had violated § 1926.451(g)(3)(iii) on or about April 30, 2021, averring that the two-point adjustable suspension scaffolds in use at the worksite "were not equipped with additional independent support lines that were equal in number and strength to the suspension lines."

GBL timely contested the Citation, thereby bringing the matter before the independent Occupational Safety and Health Review Commission (Commission) pursuant to section 10(c) of the Occupational Safety and Health Act of 1970 (Act).  29 U.S.C. § 659(c).  The matter was assigned to the undersigned Commission judge for adjudication in July 2022.  An evidentiary

---

[1] By the terms of the standard, the "independent support lines" requirement applies when employees working on a two-point adjustable suspension scaffold attach the lanyard of their personal fall arrest system to a horizontal lifeline.  The scaffolds here were designed to include such horizontal lifelines.  (Ex. R-5 at 1 & 2).

hearing was conducted in Boston on March 21 & 22, 2023.  Post-hearing briefing was completed

in August 2023.

The principal issues presented, and the decisions thereon, are as follows:

- Is the cited standard's provision that certain scaffolds "shall be equipped with additional independent support lines" that are "equal in number and strength to the suspension ropes" susceptible of only one reasonable construction?

     *Decision*:  Yes.  The quoted language permits only one reasonable construction.

- If § 1926.451(g)(3)(iii) were susceptible of multiple constructions, does it permit the reasonable construction that the required "additional independent support lines" may exist only *after* a suspension rope has failed?

     *Decision*:  No.  The construction of the standard that GBL urges is outside the bounds of reasonable interpretation.

- Did GBL establish the affirmative defense of "greater hazard"?

     *Decision*:  No.  None of the elements of the defense have been established by a preponderance of the evidence.

As set forth below, the alleged violation of § 1926.451(g)(3)(iii) is affirmed as a serious

violation and a penalty of $6,000 is assessed.

## FINDINGS OF FACT

Except where the following numbered paragraphs expressly state that evidence respecting

a matter of fact was not presented or was not preponderant, the following facts were established

by at least a preponderance of the evidence:

1.  Greg Beeche Logistics (GBL) is based in Waterford, New York.  Its business includes

designing, fabricating, installing, and maintaining adjustable suspension scaffolds for use in

construction projects throughout the United States and abroad.  (T. 10).  GBL employs between

60 and 70 employees.  (T. 13, 114; Joint Preh'rg Statement at 4).

3

2.    The focus of GBL's business is to provide suspension scaffolds used in the installation of "curtain wall" panels that form the facades of high-rise buildings.  (T. 243-44, 293-96).  GBL is known for designing and creating custom-tailored scaffold systems for construction projects of this nature and for designing and providing material hoisting assemblies that are used in conjunction with the suspension scaffolds.  (T. 243-48, 328).

3.    GBL has provided suspension scaffolds for construction projects involving famous buildings in the United States and abroad.  GBL has been involved in more than 600 projects in New York City, including work on the Empire State Building, One World Trade Center, the United Nations Secretariat Building, the Javitz Center, the Post Office/Moynihan Train Hall, and 220 Central Park South.  Projects elsewhere in the United States have included the MSG Sphere in Las Vegas, One Liberty Place in Philadelphia, and the A.J. Celebrezze Federal Building in Cleveland. International projects have included the London Bridge, the Burj Al Arab hotel in Dubai, and the Emirates Towers in Dubai.  (T. 222, 285-91, 323-25, 328-31).

4.    In 2020 and 2021, GBL provided suspension scaffolds for a project to reclad the façade of the high-rise building at One Post Office Square in Boston, Massachusetts.  The project entailed removing the building's existing curtain wall panels and installing replacement panels.  (Ex. C-30 at 3-4, 13).  The project's general contractor engaged GBL to design, erect, and maintain the scaffolds and to train the workers who would use them.  (T. 10, 312).  GBL leased the scaffolds to the general contractor.  (T. 97, 244; Ex. C-30 at 3-5, 13).  GBL also leased to the general contractor hoists and connections for material handling.  (*See* Ex. C-30 at 3-4).

5.    GBL leased to the general contractor two-point adjustable suspension scaffolds that are known as "swing stage" scaffolds.  Some of the swing stage scaffolds had one work platform and

others were two-tiered with one work platform directly over a second platform.[2] (T. 13-14, 372; Ex. C-30 at 13). A diagram and photographs that show the overall configuration of the two-tier swing stage scaffolds are included respectively in Exhibit R-5 at 2 [Bates pagination 147] and Exhibit R-6.

6. GBL's swing stage scaffolds were equipped with two suspension wire ropes and two hoist motors (one hoist motor for each suspension rope). (T. 44-46, 223; Ex. R-5 at 1). GBL designed the swing stage scaffolds so that each suspension wire rope passed through three automatic locking devices that were arrayed along the length each suspension wire rope (three devices on each wire rope, for a total of six devices on the scaffold's two suspension wire ropes). The automatic locking devices that GBL used have the brand name "blocstop." The blocstop devices are designed to automatically clamp onto a severed wire rope and prevent free fall. (T. 44-45). The blocstop manufacturer describes the devices in numerous ways, including the following: "automatic overspeed device;" "fall-arrest and secondary safety device;" and

---

[2] The two-tier swing stage scaffolds that GBL provided met the definitions set forth in OSHA's scaffolds standard of "suspension scaffold," "adjustable suspension scaffold," "two-point suspension scaffolds (swing stage)," and "multi-level suspension scaffolds," as those four terms are defined in § 1926.450(b). These definitions are as follows:

> *Suspension scaffold* means one or more platforms suspended by ropes or other non-rigid means from an overhead structure(s).

> *Adjustable suspension scaffold* means a suspension scaffold equipped with a hoist(s) that can be operated by an employee(s) on the scaffold.

> *Two-point suspension scaffold (swing stage)* means a suspension scaffold consisting of a platform supported by hangers (stirrups) suspended by two ropes from overhead supports and equipped with means to permit the raising and lowering of the platform to desired work levels.

> *Multi-level suspended scaffold* means a two-point or multi-point adjustable suspension scaffold with a series of platforms at various levels resting on common stirrups.

"secondary brake." [3]  (Exs. C-25 & C-26; Ex. R-5 at 18 [Bates 163]).  The blocstop devices have parts that are subject to wear, can develop defects, and require periodic inspection and maintenance.  (T. 253; Ex. R-5 at Bates pagination 155, 158, 162, 169-70).

7.    The configuration/routing of a single suspension wire rope on GBL's swing stage scaffolds is shown graphically by the diagram at page 3 of Exhibit R-5 (Bates pagination 148), which is shown here:



8.    The diagram in the preceding paragraph depicts the following configuration for a single suspension wire rope on the swing stage scaffold (the described routing is from left to right on the diagram):  from an electrically powered winding device located on the outrigger (not

---

[3]  The blocstop device constitutes an "automatic locking device capable of stopping the fall of the scaffold in the event one or both of the suspension ropes fail" within the meaning of the cited standard [§ 1926.451(g)(3)(iii)].  (T. 44-45; Ex. C-26 at 1).  The blocstop device also constitutes a "braking device or locking pawl which engages automatically when a hoist makes" certain "uncontrolled movements" as described in another provision in OSHA's scaffolds standard at § 1926.451(d)(16).  (T. 44-45, 230-31; Ex. C-30 at 7).

depicted in the diagram [T. 389]), the wire rope runs to a hoist motor, and from the hoist motor is threaded through a blocstop that is integrated into the hoist motor, then threaded through a sheave on an outrigger, then threaded through another blocstop, then threaded through a sheave attached to a stirrup secured to a suspended scaffold, then threaded through another blocstop secured to the same stirrup, then passed through another sheave secured to an outrigger, and finally fixed to another location on the outrigger.  (Ex. C-30 at 6).  The "hoist with integrated blocstop" as labeled on the diagram's left margin constitutes the "braking device or locking pawl which engages automatically when a hoist makes" certain "uncontrolled movements" as prescribed by § 1926.451(d)(16) for all suspension scaffold hoists.  (T. 44-45, 230-31; Ex. C-30 at 7).  The configuration reflected in the diagram in the preceding paragraph as it was realized in the swing stage scaffolds at the worksite is depicted in the photographs contained in Exhibits C-4 and C-12. (T. 106).

9.    The swing stage scaffolds used for the reclad project were designed for the workers on the scaffolds to attach the lanyards of their personal fall arrest system (PFAS) to a horizontal lifeline connected to the scaffold.  Those horizonal lifelines are depicted in the diagrams on page 1 of Exhibit R-5 for the single-tier swing stage scaffolds and on page 2 for the two-tier swing stage scaffolds.  The workers on the scaffolds used their PFAS in accordance with this GBL design. (T. 46-47, 103, 105, 400).

10.    The swing stage scaffolds in use at the site were not equipped with any additional independent support lines.  (T. 108-09).

11.    If the single wire rope depicted in the diagram in ¶ 7 were to fail in only one location and the blocstops functioned as designed, the scaffold would not collapse.  (T. 194, 403; Ex. R-5 at 4–6 [Bates pagination 149-151]).

12.    The duration of the reclad project was about eighteen months.  (T. 315).  When the inspection commenced on April 30, 2021, employees of the general contractor and at least two of its subcontractors had been using the swing stage scaffolds that lacked additional independent support wire ropes for more than a year.  (T. 108).  Several GBL employees worked on the scaffolds on or about April 30, 2021, and on dates prior.  (Ex. C-30 at 5).

13.    Mr. Gregory L. Beeche founded GBL and has been designing scaffold systems since about 1972. (T. 215-17).  Mr. Beeche has no formal training or education in engineering.  (T. 217, 234).  Mr. Beeche devised the design for the swing stage scaffolds that were used for the reclad project.  The object of his design was to eliminate a swing stage scaffold's additional independent support wire ropes.  Mr. Beeche believes his design provides the same level (or better) fall protection to workers than is provided by a swing stage scaffold that is equipped with additional independent support wire ropes.  Mr. Beeche believes further that his design is less dangerous to workers because with the elimination of the additional independent support wire ropes, workers on the scaffold do not have to manage those ropes and further because the now eliminated ropes (1) do not hang and sway below the work platform, or (2) as an alternative to hanging below the work platform, are not managed by a winding device ("winder") located on the scaffold's work platform.  (T. 223-30; *see also* T. 404-09).  Mr. Beeche believes his design conforms with the cited standard.  (T. 227-30).

14.    The project here was not the first project on which GBL has used this swing stage scaffold configuration utilizing three blocstops on each suspension wire rope, but there is no evidence of precisely when GBL devised this configuration.  (T. 227-28).

15.    GBL employs two professional engineers.  In working on projects prior to the reclad project here, these engineers have affixed their professional engineer stamp/seal to drawings of

8

GBL's swing stage scaffolds that depict GBL's six blocstop configuration with no additional independent support lines.  (T. 312-13; Ex. R-7).  Neither of GBL's professional engineers are licensed in Massachusetts, and neither affixed their stamp/seal to any of the drawings relating to the reclad project here.  (T. 232-33, 426-31).  GBL utilized the services of an outside professional engineer who was licensed in Massachusetts in connection with the reclad project here.  (T. 303-04).  No diagrams or drawings for the reclad project bearing that Massachusetts-licensed professional engineer's stamp/seal were offered or received in evidence.  The evidence is insufficient to establish that any professional engineer affixed their stamp/seal to any diagrams of the GBL scaffolds provided for the reclad project here.  (*See* T. 106-07, 303-04, 427; Ex. R-7 at 5 & 6 [Bates pagination 531 & 532]).

16.    GBL never sought a variance from compliance with 29 C.F.R. § 1926.451(g)(3)(iii) regarding the swing stage scaffold configuration used for the reclad project.  (Court Ex. 1 at 3; T. 11).

17.    Prior to OSHA commencing the inspection on April 30, 2021, GBL had not sought an interpretation from OSHA addressing whether the configuration of the swing stage scaffolds used for the reclad project conformed to OSHA's scaffolds standard.  (T. 255-57).

18.    Less than a month after the inspection commenced, and about five months before OSHA issued the Citation, GBL modified the swing stage scaffolds in use at the reclad project to conform with the configuration that OSHA informed GBL the scaffolds standard requires, equipping each swing stage scaffold with two additional independent support lines.  (Ex. C-30 at 9).  GBL's diagrams indicate that GBL reconfigured the single-tier swing stage scaffolds to have manual winders located on the work platform to manage the additional independent support wire

ropes and reconfigured the two-tier scaffolds so that the additional independent support wire ropes hung below the scaffold. (Ex. R-5 at 28 & 29 [Bates pagination 173 & 174]).

## DISCUSSION

The Commission obtained jurisdiction under section 10(c) of the Act upon the Secretary's forwarding to the Commission GBL's timely filed notice of intent to contest. 29 U.S.C. § 659(c); 29 C.F.R. §§ 1903.17(a) & 2200.33. GBL is an "employer" as defined in section 3(5) of the Act and is thus subject to the compliance provisions of section 5(a). 29 U.S.C. §§ 652(5) & 654(a). (Court Ex. 1 at 4).

To prove a violation of an OSHA standard, the Secretary must prove that (1) the cited standard applies, (2) there was noncompliance with its terms, (3) employees were exposed to, or had access to, the violative condition, and (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition. *See Astra Pharma. Prods.*, 9 BNA OSHC 2126, 2129 (No. 78-6247, 1981), *aff'd in relevant part*, 681 F.2d 691 (D.C. Cir. 1980).

The only contested element of the Secretary's burden of proof is whether there was noncompliance with the terms of § 1926.451(g)(3)(iii). [4]

### Noncompliance

The entirety § 1926.451(g)(3)(iii) is set forth in bold below, and other provisions of paragraph (g), which is captioned "Fall protection," are included for context:

---

[4] The parties stipulate that § 1926.451(g)(3)(iii) applies. (T. 13-14; Court Ex. 1 at 4). GBL acknowledges that its employees and the employees of other employers used the scaffolds and thus were exposed to the alleged violative condition. (Ex. C-30 at 5). GBL unquestionably had actual knowledge of the alleged violative condition, having designed, fabricated, and deployed the scaffolds, as well as having trained employees of the general contractor and its subcontractors on the use of the scaffolds.

### § 1926.451 General Requirements.
* * *

(g) *Fall protection.* (1) Each employee on a scaffold more than 10 feet (3.1 m) above a lower level shall be protected from falling to that lower level….

(i) …

(ii) Each employee on a … two-point adjustable suspension scaffold shall be protected by both a personal fall arrest system and guardrail system;

* * * *

(3) In addition to meeting the requirements of § 1926.502(d), personal fall arrest systems used on scaffolds shall be attached by lanyard to a vertical lifeline, horizontal lifeline, or scaffold structural member.  Vertical lifelines shall not be used when overhead components, such as overhead protection or additional platform levels, are part of a single-point or two-point adjustable suspension scaffold.

(i) When vertical lifelines are used, ….

(ii) When horizontal lifelines are used, ….

**(iii) When lanyards are connected to horizontal lifelines or structural members on a single-point or two-point adjustable suspension scaffold, the scaffold shall be equipped with additional independent support lines and automatic locking devices capable of stopping the fall of the scaffold in the event one or both of the suspension ropes fail.  The independent support lines shall be equal in number and strength to the suspension ropes.**

(iv) Vertical lifelines, independent support lines, and suspension ropes shall not be attached to each other, nor shall they be attached to or use the same point of anchorage, nor shall they be attached to the same point on the scaffold or personal fall arrest system.

The Secretary asserts that the cited standard requires that swing stage scaffolds be always be equipped with two additional independent support lines.  (Sec'y Brief-in-Chief 18).

GBL describes the Secretary's interpretation as reflecting a "more conventional configuration" for a swing stage scaffold.  (Ex. C-30 at 8-9) (*see also* T. 223, line 11; T. 259, lines 1-8; T. 402, lines 18-22; Resp't Brief-in-Chief 24 & 51; Resp't Sur-reply Brief 2 & 8).  GBL argues that the cited standard is ambiguous and may be interpreted such that the swing stage

scaffolds used for the reclad project meet the standard's requirement that the scaffold be equipped with "independent support lines" that are "equal in number and strength to the suspension ropes." (Resp't Brief-in-Chief 5, and Sur-reply Brief 2, 5 & 10).  GBL contends that in its configuration, the required "additional independent support line" comes into existence after a single-point failure of a suspension wire rope.  In GBL's interpretation, upon the occurrence of such a single-point failure, one of the three blocstops arrayed along the suspension wire rope would "activate," resulting in a segment of the failed suspension wire rope supporting the scaffold and effectively being converted to the "additional independent support line" that the standard prescribes.  (Resp't Sur-reply Brief at 5).  Put another way, GBL argues that the standard does not require that a swing stage scaffold's two "additional independent support lines" exist whenever workers are working on the scaffold, but rather that the additional independent support lines may come into existence "'later' when the suspension line fails and a blocstop is activated upon the failure of a suspension line to create another support line."  Resp't Sur-reply Brief 5. [5]

"It is axiomatic that OSHA standards must be interpreted in accordance with the natural and plain meaning of their words."  *Bunge Corp.*, 12 BNA OSHC 1785, 1791 (No. 77-1622, 1986) (consolidated).  "When determining the meaning of a standard, the Commission first looks to its text and structure," and "[i]f the wording is unambiguous, the plain language of the standard will govern."  *JESCO, Inc.*, 24 BNA OSHC 1076, 1078 (No. 10-0265, 2013).  "An undefined term's

---

[5] *See also* Resp't Sur-reply Brief 9 ("The GBL configuration of suspension lines and blocstops automatically creates (a/k/a 'activates') a support line when there is a failure of a suspension line."); Ex. C-30 at 14 ("If a single cable parted and failed, there were now two surviving cables—one of which functioned as an 'additional independent support cable' that continued to 'suspend' the scaffold after the failure."); Ex. C-30 at 8 ("In short, upon the engagement of blocstop (C), the scaffold remained affixed by the now 'independent support' wire to the outrigger.").

meaning can be determined by consulting a contemporaneous dictionary." *Centimark Corp.*, No. 20-0762, 2023 WL 2783505, *5 (OSHRC, Mar. 29, 2023).

In determining whether an administrative agency's regulation is "genuinely ambiguous" its "text, structure, history, and purpose" must be carefully considered, and "all the traditional tools of construction [must] be exhausted." *Kisor v. Wilkie*, 588 U.S. 558, 574-75 (2019). The "ambiguity flag" may not be waved "just because … the regulation [may be] impenetrable on first read." *Id.* Rather, a "court must make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning." *Id.* at 589-90. If that "conscientious effort" shows that "there is only one reasonable construction of a regulation," that construction must be given effect. *Id.* at 575. To give the regulation any different construction would be tantamount to "creat[ing] *de facto* a new regulation." *Id.*

Webster's New Universal Unabridged Dictionary (1996) defines the adjective "additional" to mean: "added; more; supplementary." *Id.* at 23.

The same dictionary contains the following definition of the adjective "independent" (the fourth of twenty-three numbered definitions for that word): "not dependent; not depending or contingent upon something else for existence, operation, etc." *Id.* at 970.

The first two of seven definitions of the subordinating conjunction "when" in the same dictionary are (1) "at what time: *to know when to be silent*," and (2) "at the time or in the event that: *when we were young; when the noise stops*." *Id.* at 2164. Grammatical usage of the conjunction "when" is described thus: "We use *when* as a conjunction meaning 'at the time that'. The clause with *when* is a subordinate clause and needs a main clause to complete its meaning. If

13

the *when*-clause comes before the main clause, we use a comma." CAMBRIDGE DICTIONARY,

at https://dictionary.cambridge.org/us/grammar/british-grammar/when (accessed Dec. 9, 2024).

Consistent with grammatical usage, the time that the cited standard specifies scaffolds must "be equipped with additional independent support lines" is "[w]hen lanyards are connected to horizontal lifelines" on the scaffold. All workers are required by § 1926.451(g)(1)(ii) to utilize personal fall arrest systems (PFAS) when working on a swing stage scaffold. GBL's scaffolds for the reclad project were designed and equipped with horizontal lifelines to which workers were required to connect, and did connect, the lanyards of their PFAS when working from the scaffolds. (Findings of Fact ¶ 9).

The only reasonable construction of the standard is that which the Secretary propounds (and which GBL characterizes as constituting a "conventional" interpretation of the standard). The standard's subordinate clause of "[w]hen lanyards are connected to horizontal lifelines" defines the time that a swing stage scaffold "shall be equipped with additional independent support lines." That time is when workers are using their PFAS on the scaffold, which workers must do in conformance with § 1926.451(g)(1)(ii) whenever they work from the scaffold.

GBL's construction of the provision is simply at odds with the plain meaning of the standard. GBL's interpretation entails nullifying the temporal component of the subordinate clause "when lanyards are connected to horizontal lifelines." Not only does GBL's construction nullify this expressed temporal component, but it replaces that temporal component with a different temporal component that the scaffolds need be equipped with the required additional independent support lines only after a suspension rope has failed.

GBL's construction is further contrary to the plain text of the statute in that under its construction the existence of the required additional support wire ropes is contingent upon the

failure of a suspension rope.  Such an interpretation is contrary to the plain meaning of the adjective "independent" and in effect nullifies that word.

In sum, to adopt the regulatory interpretation that GBL espouses would effectively rewrite the standard and impermissibly "create *de facto* a new regulation."  *Kisor v. Wilkie*, 588 U.S. at 575.

Moreover, even if there was some latent ambiguity in the cited standard, the construction that GBL urges is outside the bounds of reasonable interpretation and is thus an impermissible construction.  *See id.* at 575-76 (noting that the construction of a genuinely ambiguous regulation "must come within the zone of ambiguity the court has identified after employing all its interpretive tools").  GBL's interpretation, which hinges on the alchemic transformation of a suspension rope to the required "additional independent support" rope after that suspension rope has failed, falls outside any reasonably conceivable zone of ambiguity.

GBL requests that the Commission declare that its swing stage scaffold configuration conforms to the cited standard.  While the Commission has the discretionary authority to enter such a declaratory order, *Granite City Terminals Corp.*, 12 BNA OSHC 1741, 1748 (No. 83-882-S, 1986), having now concluded that GBL's scaffolds are non-conforming, entering such a declaratory order would constitute a clearly erroneous exercise of discretion.

In arguing that its scaffolds conform to the cited standard, GBL devotes considerable argument in furtherance of the contention that its swing stage scaffold configuration provides as good or better fall protection than OSHA's "conventional" configuration, and further that the elimination of the two additional independent support wire ropes makes for an overall safer scaffold.  The Secretary disputes those contentions and argues the contrary.

It is both unnecessary and inappropriate for the undersigned to adjudicate these competing views of the evidence in connection with determining whether GBL complied with the cited standard.

The cited standard is a specification standard, which presumes the existence of a hazard in the event of noncompliance. *See Fabricated Metal Prods., Inc*., 18 BNA OSHC 1072, 1073 n.4 (No. 93-1853, 1997) (observing that when a "specification standard" sets forth specific design requirements, "proof of noncompliance . . . establishes the existence of a hazard"); *Bunge Corp. v. Sec'y of Lab.*, 638 F.2d 831, 834 (5th Cir. 1981) (observing that violation of a specification standard presumes a hazard and that whether the condition resulting from the violation of a specification standard was hazardous "is relevant only to whether the violation constitutes a 'serious' one"). The presumed hazard that § 1926.451(g)(3)(iii) aims to prevent is scaffold collapse upon the failure of a suspension rope. (T. 173). Even if GBL's configuration does provide equivalent or better protection against scaffold collapse than provided by conformance with the cited specification standard, the standard does not provide for any alternative means of compliance. *See R & R Builders, Inc.*, 15 BNA OSHC 1383, 1391 (No. 88-0282, 1991) ("If a specifications standard does not provide for any alternative form of compliance, the fact that the employer has implemented an alternative measure instead of the specified measure cannot, in itself, justify vacating a citation").

In view of the unambiguous meaning of the standard, GBL seeks in effect for the Commission to alter the standard to replace the temporal component that it espouses with the standard's expressed temporal component. But the Commission has no authority to alter OSHA's safety standards in its adjudicatory proceedings, "which only concerns itself with the employer's

alleged violation of an existing standard." *Carabetta Enters. Inc.*, 15 BNA OSHC 1429, 1432 (No. 89-2007, 1991).

Under section 6(d) of the Act, the Secretary (not the Commission) is empowered to grant an employer's application for a variance from the requirements of a standard if the employer "has demonstrated by a preponderance of the evidence that the conditions, practices, means, methods, operations, or processes used or proposed to be used by an employer will provide employment and places of employment to his employees *which are as safe and healthful as those which would prevail if he complied with the standard*." 29 U.S.C. § 655(d) (emphasis added). The Secretary has promulgated a detailed regulation that sets forth the adjudicatory procedures for an application for a variance under section 6(d). 29 C.F.R. pt. 1905 (§§ 1905.1–1905.51). The Commission has no authority under the Act to grant an employer a variance from the requirements of a standard on the asserted basis that the employer's means of compliance are as safe or safer than the requirements of an OSHA standard. *See also Carabetta Enters., Inc.*, 15 BNA OSHC at 1432 (observing that as an alternative to applying for a variance, an employer who believes that a standard's requirements are "arbitrary or inappropriate" may "seek to have the Secretary alter her standard through rulemaking proceedings," but "[s]uch alterations to OSHA's safety standards cannot . . . be obtained in adjudicatory proceedings before the Commission"; "[i]n these proceedings, employers cannot question a standard's wisdom").

GBL argues that OSHA has not before "objected" to its use of swing stage scaffolds at seven construction sites at which it had previously provided scaffolds that were similar to the scaffolds provided for the reclad project here, seeming to suggest that OSHA implicitly approved that configuration. (Resp't Brief-in-Chief 58; Resp't Sur-reply Br. 5–7). First, there is no substantial evidence that OSHA inspected any of the seven construction sites to which GBL refers.

Second, even if OSHA had inspected any of those sites, any failure to have cited GBL for the non-compliant scaffolds would not insulate GBL from being cited for the violation established here. *See Cedar Constr. Co. v. OSHRC*, 587 F.2d 1303, 1306 (D.C. Cir. 1978) (declining to allow an employer to rely on OSHA's failure to identify a violative condition that was present during a prior inspection because to do so "would discourage self-enforcement of the Act by businessmen who have far greater knowledge about conditions at their workplaces than do OSHA inspectors"); *Cardinal Indus., Inc.*, 14 BNA OSHC 1008, 1013 (No. 82-427, 1989) ("The Secretary's failure to issue a citation for a violation of a standard does not immunize an employer from future enforcement of that standard.").

GBL also complains about OSHA officials declining, prior to its issuance of the Citation, GBL's request to attend at GBL's facility GBL's testing of mockups of suspended scaffolds to demonstrate the safety of the scaffolds used at the reclad project.  (Resp't Brief-in-Chief 59-60; Resp't Sur-reply Brief 5–7).  Section 8(a)(2) of the Act empowers the Secretary to conduct inspections and investigations "within reasonable limits and in a reasonable manner." 29 U.S.C. § 657(a).  OSHA's decision not to attend the demonstration during its investigation was not unreasonable.

The Secretary has established that GBL failed to conform to the requirements of § 1926.451(g)(3)(iii) and has thus proven all elements of the alleged violation.

### Greater Hazard Defense

GBL interposes the affirmative defense that compliance with the cited standard poses a greater hazard than compliance.  The Commission described the elements of this defense in *Spancrete Ne., Inc.*, 15 BNA OSHC 1020, 1022 (No. 86-0521, 1991):

> To establish the greater hazard defense, an employer must prove
> each of the following three elements, namely that: (1) the hazards
> created by complying with the standard are greater than those of

18

noncompliance; (2) other methods of protecting its employees from
the hazards are not available; and (3) a variance is not available or
that application for a variance is inappropriate.

It is undisputed that GBL did not apply for a variance, but GBL asserts that such failure was excusable because it believed its configuration conformed to the cited standard. To the extent that GBL held the subjective belief that its configuration complied with the cited standard, that belief was unreasonable because, as discussed above, the cited standard is susceptible of only one reasonable construction. GBL's failure to apply for a variance cannot be excused where it unreasonably concluded that its scaffolds conformed with the standard's requirements.

Even if GBL's failure to apply for a variance were excusable, it failed to establish the first element of the defense, which requires that an employer show "that hazards created by compliance … outweigh the hazards of noncompliance." *Trinity Indus., Inc.*, 15 BNA OSHC 1985, 1986 (No. 89-2316, 1992).

GBL asserts that its configuration of the standard mitigates the severity of a "tipping" hazard in the event of a suspension wire rope failure and eliminates the "wind load" that is exerted on supporting wire ropes that hang below the scaffolds. (Resp't Brief-in-Chief 61). GBL contends further that its configuration "provided greater safety" than a conforming scaffold because GBL's configuration "reduced the likelihood of human error by relieving a crew on the suspended scaffolding of the duty to monitor and manage support lines hanging over the side," so that "[i]nstead, the crew could focus its attention on the safe placement of very large, very heavy wall panels in a tight location in windy conditions." *Id.* 62.

Here, the hazard of noncompliance with the cited standard is the collapse of the scaffold upon the failure of a suspension rope. (T. 173-77). The hazards of compliance that GBL identifies

are lesser hazards than scaffold collapse, and so the first element of the greater hazard defense is not proven.

As to the second element of the defense, the evidence is insufficient to establish that the claimed greater hazard created by support wire ropes that hang below the scaffolds and that can be buffeted by winds could not be eliminated by the use of winding devices to collect and manage the support ropes so that the ropes would not hang below the scaffold.  It is notable that less than a month after OSHA commenced the inspection and investigation, GBL equipped its single-tier scaffolds with the support ropes that OSHA informed GBL were required, and that GBL equipped the single-tier scaffolds with manual winding devices to manage the support wires so that they would not hang below the scaffold.  (*See* Finding of Fact ¶ 18).

GBL has not met its burden of proving any of the three elements of the greater hazard defense.

All the elements of the alleged violation of § 1926.451(g)(3)(iii) having been established, and the affirmative defense of greater hazard having not been proven, the alleged violation is affirmed.

### "Serious" Classification

The Secretary alleges that the violation was "serious."  Under section 17(k) of the Act, a violation is serious if "there is a substantial probability that death or serious physical harm could result." 29 U.S.C. § 666(k).  To prove that a violation is serious, "the Secretary need not establish that an accident is likely to occur," but rather "that an accident is possible and there is a substantial probability that death or serious physical harm could result from the accident."  *Flintco, Inc.*, 16 BNA OSHC 1404, 1405 (No. 92-1396, 1993).

The greater weight of the evidence is that a collapse of the scaffold was possible because the scaffolds lacked the additional independent support lines that the cited standard requires.  The

structural engineer whose testimony the Secretary presented provided credible and reliable testimony that even if the blocstop devices functioned as they are designed, the entire scaffold could collapse if a suspension wire rope were to fail in the two locations depicted graphically in Exhibit C-23.  (T. 172-73, 191-92; Exs. C-22, C-23).  In contrast, a professional engineer who is employed by GBL explained that the GBL configuration would prevent scaffold collapse in the event of a "single point failure" in a suspension rope (if the blocstop devices functioned as designed).  (T. 403).  While simultaneous multiple failures in a single wire rope may be unusual, the weight of the evidence establishes that such failures have occurred and further that such an occurrence is more probable than the simultaneous single-point failures of both a suspension rope and an additional independent support rope.  (T. 173-75, 191-92, 442-46).

It is manifest that upon the collapse of a swing stage scaffold there is a substantial probability that death or serious physical harm could result, and so the violation is appropriately classified as serious.

## Penalty

The Commission is the final arbiter of penalties.  *Hern Iron Works, Inc.*, 16 BNA OSHC 1619, 1622, (No. 88-1962, 1994); *Valdak Corp.*, 17 BNA OSHC 1135, 1138 (No. 93-0239, 1995) ("The [OSH] Act places limits for penalty amounts but places no restrictions on the Commission's authority to raise or lower penalties within those limits"), *aff'd*, 73 F.3d 1466 (8th Cir. 1996).

The maximum penalty for the serious violation proven here is $13,653.  29 C.F.R. § 1903.15(d)(3) (2021).

Section 17(j) of the Act requires the Commission, in assessing an appropriate penalty, to give "due consideration" to the "gravity of the violation," the "size of the business of the employer," the "good faith of the employer," and the employer's "history of previous violations." 29 U.S.C. § 666(j).  Of these factors, gravity is the principal factor "and is based on the number of

employees exposed, duration of exposure, likelihood of injury, and precautions taken against injury." *Siemens Energy & Automation, Inc.*, 20 BNA OSHC 2196, 2201 (No. 00-1052, 2005).

The severity of the violation is high given the severity of the potential injury in the event of a scaffold collapse. On this evidentiary record, the probability of an injury occurring is assessed as being "lesser" (not the "higher" probability assigned by OSHA [T. 113-14]), resulting in the overall gravity of the violation regarded to be moderate.

Some penalty mitigation is appropriate to account for GBL's moderate size (50 to 60 employees). No penalty mitigation is allowed for good faith, because GBL's assessment that its scaffolds conformed to the cited standard was objectively unreasonable. No penalty mitigation or enhancement is made to address GBL's history of previous violations. The only evidence of GBL having been previously inspected by OSHA was an inspection in 2017 that resulted in GBL being cited for a violation of a standard other than the scaffolds standard. (T. 121-22). There is no evidence that GBL has withstood more recent inspections or that OSHA had ever previously inspected any GBL scaffolds. It is notable that GBL was noncompliant with the cited standard at approximately seven construction projects before the inspection of the reclad project here. (Resp't Sur-reply Brief 5–7).

Upon consideration of the statutory penalty factors, a penalty of $6,000 is assessed.

## ORDER

The foregoing decision constitutes findings of fact and conclusions of law on all material issues of fact, law, or discretion in accordance with Commission Rule 90(a)(1). 29 C.F.R. § 2200.90(a)(1).

Based upon the foregoing findings of fact and conclusions of law, it is ORDERED that

Citation 1, Item 1, alleging a serious violation of 29 C.F.R. § 1926.451(g)(3)(iii) is AFFIRMED

as a serious violation and a penalty of $6,000 is ASSESSED.


_s/ *William S. Coleman*_

WILLIAM S. COLEMAN
Administrative Law Judge


Dated:

## CERTIFICATE OF SERVICE

This is to certify that a copy of the Notice/Order was sent to the parties listed below electronically using the Commission's E-Filing System on December 10, 2024.


Maia S. Fisher, Regional Solicitor
U.S. Department of Labor
Office of the Solicitor
John F. Kennedy Federal Building, E-375
15 New Sudbury Street
Boston, MA 02203
Attention: Nathan C. Henderson
Attention: William J. Mahoney
Email: henderson.nathan.c@dol.gov
Email: mahoney.william@dol.gov

Robert Shenker Wolfe
**ROBERT WOLFE ASSOCIATES**
25 Leverett Street
Gloucester, Massachusetts 09130
Email: rwassociates@prodigy.net




 _/s/ Latoya Wade_____
Latoya Wade, Legal Assistant

Post Office Address:
Judge William S. Coleman
OSHRC
One Lafayette Center
1120 20th Str., N.W. - 9th Floor
Washington, D.C.  20036-3419
(202) 606-5405 FAX (202) 606-5409